Stewart R. Pollock (SBN 301356)
spollock@edelson.com
EDELSON PC
123 Townsend Street
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiff and the Putative Class*

**IN THE UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| JASON PARKER, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>HEY, INC., a Delaware corporation, and TWITTER INC., a Delaware corporation.<br><br>*Defendants*. | Case No. 3:16-cv-4884<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**(1) Violations of the Alabama Right of Publicity Act, Alabama Code 1975 § 6-5-770, *et seq.***<br><br>**DEMAND FOR JURY TRIAL** |

**CLASS ACTION COMPLAINT**

Plaintiff Jason Parker brings this Class Action Complaint and Demand for Jury Trial against Defendants Hey, Inc. ("Hey") and Twitter, Inc. ("Twitter") (collectively, "Defendants") to stop their unlawful practice of using Alabama residents' identities for commercial purposes without their consent. Plaintiff, on behalf of himself and all others similarly situated, alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

**NATURE OF THE ACTION**

1. Defendant Hey owns and operates a controversial online trading game in which players collect the profiles of real-life people as if they were baseball cards (the "App"). The vast

majority of the people displayed in the App never agreed to participate. Rather, they appear in the App because Defendant Twitter shared their Twitter profiles with Hey without their consent.

2. Specifically, in or around June 2015, Hey entered into a partnership with Twitter to import Twitter's user accounts into the App. In the course of their partnership, Twitter provided Hey with a license to access its proprietary application programming interface ("API"). Since acquiring access, Hey has used Twitter's API to import the identities—including names and personal photographs—of Twitter users into the App without their knowledge or consent. From there, Hey used the Twitter users' names and pictures in profile cards that are listed in the App and collected and traded by the players.

3. Initially, Hey operated the App as "Stolen," and encouraged players to "buy," "own" and even "steal" real-life people by using virtual currency. But this version of the App received intense public scrutiny. Indeed, in January 2016, United States Representative Katherine Clark of Massachusetts learned about the App and sent a letter to Twitter's CEO urging him to "immediately suspend [the App's] access to Twitter until nonconsenting profiles are removed and safeguards are implemented that ensure that no Twitter profile may be used by the application without clear, express consent."[1]

4. Instead of heeding Representative Clark's admonition, Hey merely re-branded the App as "Famous: The Celebrity Twitter," and softened the language used in the game—players now "invest" in people instead of "buying" them. Rebranding aside, the App's nature and core functionality (and look and feel) remain exactly the same: it still coopts the full names and photographs of real-life Twitter users without their consent, and still allows its players to display ownership over real-life people by spending virtual currency.

5. Twitter, for its part, continues to provide Hey with its users' full names and photographs even though it has specific knowledge that Hey displays and incorporates them into the App—and thus exploits them for a commercial benefit—without their consent.

---

[1] *@RepKClark*, Representative Katherine Clark, https://twitter.com/RepKClark/status/687753566782636032 (last visited Aug. 24, 2016).

[2] *Serious Business looks for life beyond Friends For Sale! | VentureBeat | Business | by*

6. As explained more fully below, Defendants' conduct is expressly prohibited by Alabama's Right of Publicity Act (the "Act"), Alabama Code 1975 § 6-5-770 *et seq*.

7. Accordingly, to put an end to this unlawful conduct, Plaintiff Jason Parker—an Alabama resident whose full name and photograph is displayed in the App—brings this case on behalf of himself and a class of similarly situated individuals, and seeks: (i) an injunction requiring Hey to remove their personal identities from the App, including their names and photographs, (ii) an injunction requiring Twitter to revoke Hey's API access, and (iii) damages arising from Defendants' violation of the Alabama Right of Publicity Act, including actual damages, statutory damages, and reasonable attorneys' fees and costs.

**PARTIES**

8. Plaintiff Jason Parker is a natural person and a citizen of the State of Alabama.

9. Defendant Hey, Inc. is a corporation existing under the law of the State of Delaware with its principal place of business at 121 Red Hawk Court., Brisbane, California 94005.

10. Defendant Twitter, Inc. is a corporation existing under the laws of the State of Delaware with its principal place of business at 1355 Market Street Suite 900, San Francisco, California 94103.

**JURISDICTION AND VENUE**

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the putative Class is a citizen of a state different from Defendants, (ii) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) none of the exceptions under the subsection apply to this action.

12. This Court has personal jurisdiction over Defendants because they both transact significant business in this District, and the unlawful conduct alleged in the Complaint occurred in and emanated from this District.

13. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants maintain their corporate headquarters and principal places of business in this District.

**INTRADISTRICT ASSIGNMENT**

14. Pursuant to Civil Local Rule 3-2(d), this case shall be assigned to the San Francisco Division.

**COMMON FACTUAL ALLEGATIONS**

**I.   The Alabama Right Of Publicity Act**

15. In 2015, the Alabama Legislature formally recognized that every Alabama resident has the right to exercise commercial control over their identities, and codified that right by enacting the Alabama Right of Publicity Act, Alabama Code 1975 § 6-5-770 *et seq*.

16. The Act establishes a freely transferable and descendible property right in the commercial use of one's identity by providing:

> There is a "Right of Publicity" in any Indicia of Identity (both singular and plural) of every Person, whether or not famous, which right endures for the life of the Person and for fifty-five (55) years after his or her death, whether or not the Person commercially exploits the right during his or her lifetime. The right is freely transferable and descendible, in whole or in part, and shall be considered property of a decedent's estate unless otherwise transferred.

Alabama Code 1975 § 6-5-771(3).

17. Under the Act, the phrase "Indicia of Identity" is broadly defined to "include those attributes of a Person that serve to identify that Person to an ordinary, reasonable viewer or listener, including but not limited to, name, signature, photograph, image, likeness, voice, or a substantially similar imitation of one or more of those attributes." Alabama Code 1975 § 6-5-771(1).

18. To safeguard and protect Alabama residents' publicity rights, Section 6-5-772 of the Act states:

> (a) Except as otherwise provided in this article, any Person or entity who uses or causes the use of a Person's Indicia of Identity, on or in products, goods, merchandise, or services entered into commerce in this State, or for purposes of advertising or selling, or soliciting purchases of, products, goods, merchandise, or services . . . or for false endorsement, without consent shall be liable under this chapter to such Person, or to a holder of such Person's rights.
>
> (b) Liability may be found under this section without regard as to whether the use is for profit or not for profit.

Alabama Code 1975 § 6-5-772(a)-(b).

**II. Hey Develops The App, Initially Branded As "Stolen"**

19. Hey is a mobile application development company founded by Siqi Chen.

20. In 2007, Chen created a game called "Friends for Sale." In that game, users connected to their Facebook accounts and bought and sold their Facebook friends' profiles. Some described Friends for Sale as a "game where people can 'buy' other people as if they are pets."[2] The pernicious nature of "ownership" was a reflection of Chen's vision for the game, as explained by a colleague:

> [Chen's Friends for Sale] tak[es] advantage of people's existing relationships – for example, wanting to own your girlfriend or your wife, being peeved that some random dude buys that person away from you, buying nicknames for people, and baking that into the core app. . . .[3]

21. After years of profiting off the virtual sale of people, Chen sold Friends for Sale to gaming company Zynga Inc. in 2009 for an undisclosed amount.

22. In June 2015, Chen began developing the App. Initially branded as "Stolen," the App was Chen's expansion upon his "Friends for Sale" concept of "owning" others. Instead of buying and selling friends, though, Chen programmed the App to allow users to own almost anyone with a Twitter account.

23. Lauren Hockenson, a writer for The Next Web, described the App's features:

> The core gameplay essentially sucks in all of the available public data from Twitter and assigns values to user names. Players on Stolen are encouraged to buy these users with currency . . . You buy people, and then other people pay more than you to take that person away . . . To be honest, it felt particularly weird going on an app I only knew about a few days ago to find people who follow me on Twitter have driven up my value [by buying me]. That people are sparring back and forth to take ownership of my account.[4]

---

[2] *Serious Business looks for life beyond Friends For Sale! | VentureBeat | Business | by Dean Takahashi*, http://venturebeat.com/2009/11/30/serious-business-looks-for-life-beyond-friends-for-sale/ (last visited Aug. 24, 2016).

[3] *Facebook Game Developer Serious Business Raises $4M Series A | SocialTimes*, http://www.adweek.com/socialtimes/facebook-game-developer-serious-business-raises-4m-series-a/211878 (last visited Aug. 24, 2016).

[4] *Here's the 411 on Stolen – the app that turns your Twitter account into tradeable commodity*, http://thenextweb.com/apps/2016/01/13/what-the-hell-is-stolen (last visited Aug. 24, 2016).

24. As Ms. Hockenson described, the App relies exclusively on data from Twitter. By entering into a partnership with Twitter—the operator of the popular social network—Hey was able to access the Twitter API through which Twitter disclosed (and continues to disclose) individuals' names and photographs. Hey then included the data from Twitter in the App.

25. When playing the game, the App presented an array of individuals that can be bought for a price. Notably, the vast majority of the individuals listed for sale never registered to use the App and never consented to (or even had knowledge that) their names, photographs, and likenesses were displayed in the App and available for purchase by strangers.

26. To "buy" a listed person, the App required players to have sufficient funds in their accounts. The funds in this case are virtual credits. The App gave away a limited amount of these virtual credits to users for free, and also allowed users to purchase additional currency for real money. With sufficient funds in hand, the player taps on the desired target's account and pays the requisite price.

27. Once a user purchases a targeted person, that target is added to their "collection."

28. However, as soon as a purchase was made, any other user can "buy" that same person for a higher price. Thus, a profile "owned" by one player could be "stolen" by another.

29. While some may find that proposition "owning" and "stealing" other people attractive, many more were appalled. Indeed, when Hockenson of The Next Web reviewed the App in early 2016, she was one of the first to report of the problems with the App. She reported that the App "commoditize[s] [] users without their knowledge" and that the App "crafts a potential opening for harassment" because people who "own" others' profiles can rename them.[5] Indeed, "[i]t's not too much of a mental stretch to see how this can be used to harm someone personally" especially because "you can't opt out of the game."[6] That is, a person did not want to be "owned" by another, they'd be without recourse.

30. In the days that followed Hockenson's report, the App became more popular than

[5] *Id.*
[6] *Id.*

ever and other publications took note of the App's troubling purpose. Gadgette.com reported:

> it's tremendously unnerving to have someone tell you out of nowhere that they "own" you now. That your name and likeness is being traded on an app you had no knowledge of and hadn't given permission to. The whole concept of people being able to own, buy and sell other people without their consent is absolutely abhorrent to us, and raises a slew of problems that it's clear the team at [the App] haven't anticipated.
>
> * * *
>
> As someone who's received a fair amount of harassment and trolling over the last few months, I can't tell you how disquieting it was to see a total stranger's name plastered across my Twitter account as my "owner." And worse, once someone buys you, they can write whatever they like on your page, giving you a 'nickname', advertising their products, whatever they want. There doesn't even seem to be a swear filter in place [for the nicknames]. . . .[7]

31. Another publication stated that "[t]his design is making waves among users, with some being uncomfortable with the idea of their Twitter profile being purchased by strangers."[8]

32. Indeed, many of those who were "uncomfortable" with the App made their feelings known to the App's Twitter account as the sampling of tweets below show:

(**Figure 1**, showing feedback and response from the App @getstolen.)

[7] *Interview: Stolen, the problematic app that lets you buy and sell people on Twitter | Gadgette*, http://www.gadgette.com/2016/01/13/stolen-app/ (last visited Aug. 24, 2016).

[8] *Stolen: This iOS Game Lets You Buy Your Favorite Twitter Accounts | SocialTimes*, http://www.adweek.com/socialtimes/stolen-this-ios-game-lets-you-buy-your-favorite-twitter-accounts/632760 (last visited Aug. 24, 2016).



(**Figure 2**, same)

33. On January 14, 2016, U.S. Representative Katherine Clark of Massachusetts sent a letter to Twitter's CEO, Jack Dorsey, expressing her concern about the App:

> I write today to express my concern regarding the [App] that allows users to buy and sell images of Twitter users' profiles without their express consent.
>
> * * *
>
> My concern is that given the widespread harassment that already occurs on your platform, particularly harassment targeting women and people of color, the [App] will only provide another tool to harass, bully, and intimidate. Imagine the implications of these application for the domestic violence survivor who receives a notification that their former abuser now 'owns' them, or the cyber abuse activist who is purchased by the person whose violent threats have forced them from their home.
>
> * * *
>
> I urge you to immediately suspend [the App's] access to Twitter until nonconsenting profiles are removed and safeguards are implemented that ensure that no Twitter profile may be used by the application without clear, express

consent.[9]

34. Shortly after Representative Clark sent this letter to Twitter, the App temporarily shut down. The publication The Cult of Mac reported that it was "taken off the [Apple] App Store by its developer due to privacy concerns . . . in the wake of an earlier article in The Guardian in which journalist Leigh Alexander called [the App] 'a privacy minefield.'"[10]

**III. Hey Re-releases the App Under the Moniker "Famous: The Celebrity Twitter"**

35. Unfortunately for consumers, respite from the App lasted less than a month. Once the controversy died down in February 2016, Hey re-released the App, this time calling it "Famous: The Celebrity Twitter."[11]

36. Aside from giving it a new name, the nature of the App and core functionality remain exactly the same as before: the App still displays real life Twitter users, including their full names and photographs, without their consent and players still collect these real life people from the App's marketplace using virtual currency.

37. This time, however, Hey masked the language used in the App to avoid controversy. For example, Hey changed the price to claim a person's profile from the "§" virtual currency to "hearts." But just as before, Hey sold hearts virtual currency in its marketplace for real money. Hey also changed the terms for ownership: instead of "buying" people, players now "invest" in them.

38. Notably, Hey's re-released version of the App continues to misappropriate the full names and pictures of tens of thousands of real people without their consent just as it did before. And, just as before, Hey exclusively obtains data from Twitter through the API partnership. At all times, Twitter maintains full and complete control over its API, yet it has failed to revoke Hey's access and continues to take steps to allow the use of its users' names and pictures in the

---

[9] *@RepKClark*, Representative Katherine Clark, https://twitter.com/RepKClark/status/687753566782636032 (last visited Aug. 24, 2016).

[10] *Controversial Stolen app that let you 'buy' people shuts down*, http://www.cultofmac.com/406979/controversial-stolen-app-let-you-buy-people-shuts-down/ (last visited Aug. 24, 2016.)

[11] *Famous.AF/Stolen | AngelList*, https://angel.co/famousaf (last visited Aug. 24, 2016).

1  App without consent. Twitter continues providing the data to Hey even after being notified in
2  writing by a prominent U.S. Representative that Hey was using the API to exploit the identities
3  of its users without their consent.

4  39. A review of the re-released App demonstrates that it is Stolen with a new name.
5  To start, the App again displays acquired Twitter profiles in its marketplace, along with the
6  individual's full name, Twitter username, and picture. *See* Figure 3.



(**Figure 3**, redacted to protect privacy.)

\*     \*     \*

20  40. To be sure, Twitter neither informs its users that their names and photographs are
21  being accessed by Hey and featured in the App, nor obtains (or even seeks) their consent before
22  allowing Hey to import them.

23  41. Likewise, Hey never notifies or seeks consent from the tens of thousands of
24  people featured in the App. Indeed, Hey knows that the vast majority of the public disapproves
25  of its App and wouldn't voluntarily allow it to use their names and photographs in a game that
26  allows players to collect other human beings.

27  42. In an interview, the developer of the App, Siqi Chen, admitted that the App

wouldn't work if he had to obtain consent from each user before using their names and pictures in the App:

> [Interviewer]: But if you're going to do it that way, doesn't it make more sense to let people opt in and say, 'I would like to be traded. I would like to have a card on this site and for people to be able to steal me'? Doesn't it make more sense to do that than to bring in people without their knowledge or permission and not even let them know?
>
> Chen: The way we think about it is it's a game on Twitter and so it doesn't really work if we can't show you the people that you actually follow and care about on Twitter.[12]

**FACTS SPECIFIC TO PLAINTIFF PARKER**

43. In May 2008, Plaintiff Jason Parker joined Twitter. At that time he established a profile page and selected a Twitter username. Sometime later (but before Hey began operating the App), Plaintiff uploaded a personal photograph to the Twitter website.

44. On July 21, 2016, Plaintiff discovered that his Twitter profile—including his name and personal photograph—had been uploaded to the App and is being displayed for players to collect in exchange for virtual currency.

45. Plaintiff never joined or registered to use the App, and has never provided his consent to either Hey or Twitter to use his identity, including his name and picture, in the App.

**CLASS ACTION ALLEGATIONS**

46. **Class Definitions**: Plaintiff Jason Parker brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of himself and a class defined as follows:

> All Alabama residents whose (i) Twitter profiles appear or have appeared in the App (ii) without their consent.

Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely

---

12 *Interview: Stolen, the problematic app that lets you buy and sell people on Twitter | Gadgette,* http://www.gadgette.com/2016/01/13/stolen-app/ (last visited Aug. 24, 2016).

request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

47. **Numerosity**: The exact number of Class members is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, Defendants obtained and displayed Plaintiff's and Class members' identities without consent who fall into the definition of the Class. Class members can be identified through Defendants' records.

48. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the putative Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

    a.    Whether Hey used Plaintiff's and the Class members' identities for a commercial purpose;

    b.    Whether Hey obtained Plaintiff's and Class members' written consent to use their identities for a commercial purpose;

    c.    Whether Defendants' conduct violated the Alabama Right of Publicity Act; and

    d.    Whether Plaintiff and the Class are entitled to injunctive relief.

49. **Typicality**: Plaintiff's claims are typical of the claims of other members of the Class, in that Plaintiff and the Class members sustained damages arising out of Defendants' uniform wrongful conduct.

50. **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex class actions. Plaintiff has no interest antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

51. **Policies Generally Applicable to the Class**: This class action is appropriate for

certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class, and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply and affect members of the Class uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. Plaintiff and the members of the Class have suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

52. **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered and uniformity of decisions ensured.

**FIRST CAUSE OF ACTION**
**Violation of the Right of Publicity Act Against Hey**
**Alabama Code 1975 § 6-5-770, *et seq.***
**(On behalf of Plaintiff and the Class)**

53. Plaintiff incorporates the foregoing allegation as if fully set forth herein.

54. The Alabama Right of Publicity Act prohibits the unauthorized use of a Person's indicia of identity, which includes their names, photographs, images, likeness, or substantially

similar imitation of one's identity, without consent.

55. Plaintiff and the Class members are "Persons" under the Act because they reside in the State of Alabama.

56. The App is offered for download through the Apple App Store and Google Play, and on information and belief, the App has been downloaded onto the cell phones of individuals located in the State of Alabama. As such, the App has been entered into commerce in the State of Alabama.

57. As described herein, Hey uses the identities of Plaintiff and each member of the Class by displaying and featuring their names and personal photographs in the App, and allowing players to collect them.

58. Plaintiff and members of the Class have not provided Hey with consent to use their identities, including their names and photographs, in the App or for any purpose.

59. As such, pursuant to Section 6-5-774(2) of the Act, Plaintiff and the members of the Class seek injunctive relief to compel Hey to remove their identities, including their names and pictures, from the App and to destroy any copies of such data stored in its database.

60. Further, pursuant to Section 6-5-774 (1) of the Act, Plaintiff and the members of the Class seek monetary damages, including statutory damages of $5,000 and all profits that Hey derived from the misappropriation of their identities, along with punitive damages, and costs and attorneys' fees.

**SECOND CAUSE OF ACTION**
**Violation of the Right of Publicity Act Against Twitter**
**Alabama Code 1975 § 6-5-770, *et seq.***
**(On behalf of Plaintiff and the Class)**

61. Plaintiff incorporates the foregoing allegation as if fully set forth herein.

62. Though Hey is the entity that owns and operates the App, Defendant Twitter is also liable for causing its users' identities, including their names and pictures, to be used in the App.

63. Specifically, Twitter provides Hey with access to its API even though it knows

that Hey was using the API to import and display Twitter users' profiles—including their names and personal pictures—into its App without such users' consent.

64. Twitter at all times maintained full and complete control over its API, including the right to revoke access from any third party, including Hey, at any time and for any reason. To revoke access, all Twitter would need to do is enter a simple computer command into its server. Thus, Twitter had the practical ability to revoke access from Hey at any time.

65. Had Twitter revoked access to its API, Hey's violation of Plaintiff and the Class's publicity rights would have immediately stopped. That's because Hey relies exclusively on Twitter to supply it with names and photographs to fill the App's inventory of real people. Had Twitter revoked Hey's access to its API, the only people that would have been available for players to collect would be those that voluntarily downloaded and joined the App themselves. In other words, without Twitter, the App couldn't violate Plaintiff's and the Class's right of publicity.

66. While it's unclear as to whether Twitter initially had knowledge that Hey was misappropriating its users' names and personal photographs by displaying and featuring them in the App, there can be no dispute that Twitter acquired specific knowledge of Hey's misconduct when U.S. Representative Clark notified Twitter's CEO, in writing, about her concerns with the App on January 14, 2016.

67. Unfortunately, despite receiving written notice from a U.S. Representative that Hey was misappropriating and exploiting its users' identities without their consent, Twitter nonetheless continued to provide Hey with access to its API. And because of Twitter's refusal to revoke Hey's access to its API, Hey has continued to use and rely on the API to import the names and photographs of nonconsenting Twitter users into its App.

68. Further, by failing to revoke Hey's access to its API and knowingly supplying Hey with its users' names and photograph for the purpose of featuring them in its App, Twitter is causing Plaintiff's and the Class's identities to be misappropriated and their rights of publicity to be violated.

69.  To be sure, there are a number benefits that Twitter enjoys when developers such as Hey use its API, including increased brand awareness, increased website traffic, and increased user interaction and engagement (all of which translate into increased advertising revenue).

70.  As such, pursuant to Section 6-5-774(2) of the Act, Plaintiff and the members of the Class seek injunctive relief to compel Twitter to stop disclosing their names and photographs, to Hey and to revoke Hey's access to the Twitter API.

71.  Further, pursuant to Section 6-5-774 (1) of the Act, Plaintiff and the members of the Class seek monetary damages, including statutory damages of $5,000 and all profits that Twitter derived from the misappropriation of their identities, along with punitive damages, and costs and attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Jason Parker, individually and on behalf of the Class, prays that the Court enter an Order:

(a)  Certifying this case as a class action on behalf of the Class defined above, appoint Jason Parker as Class Representative, and appoint his counsel as Class Counsel;

(b)  Declaring that Defendants' actions described herein constitute a violation of the Alabama Right of Publicity Act;

(c)  Awarding injunctive and other equitable relief as necessary to protect the interest of the Class, including, *inter alia,* an order (1) compelling Twitter to stop disclosing their profile information, including their names and photographs to Hey and to revoke Hey's access to the Twitter API, and (2) compelling Hey to remove their profile information, including their names and photographs from the App, and to destroy any copies of such data stored on its database;

(d)  Awarding the greater of actual damages, including profits derived from the unauthorized used of the same, or statutory damages in the amount of $5,000 per violation to the members of the Class;

(e)  Awarding punitive damages;

(f) Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

(g) Awarding Plaintiff and the Class pre- and post-judgment interest; and

(h) Granting such other and further relief as the Courts deems equitable and just.

**JURY DEMAND**

Plaintiff requests trial by jury of all matters that can be so tried.

Dated: August 24, 2016

Respectfully Submitted,

**JASON PARKER**, individually and on behalf of all other's similarly situated,

By: /s/ Stewart Pollack
One of Plaintiff's Attorneys

Stewart R. Pollock (SBN 301356)
spollock@edelson.com
EDELSON PC
123 Townsend Street
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiff and the Putative Class*