Pages 1 - 54

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

```
JASON PARKER, individually and )
on behalf of all others        )
similarly situated,            )
                               )
          Plaintiffs,          )
                               )
  VS.                          )   No. C 16-4884 WHA
                               )
HEY, INC., a Delaware          )
corporation, and TWITTER, INC.,)
a Delaware corporation,        )
                               )
          Defendants.          )
_____)   San Francisco, California
                                    Thursday, December 8, 2016
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

```
                    EDELSON PC
                    350 N LaSalle St, 13th Floor
                    Chicago, Illinois 60654
               BY:  ALEXANDER TIEVSKY, ESQUIRE

                    EDELSON PC
                    123 Townsend Street, Suite 100
                    San Francisco, California 94107
               BY:  STEWART POLLOCK, ESQUIRE
```

For Defendant Twitter, Inc.:

```
                    COOLEY GODWARD
                    101 California Street, 5th Floor
                    San Francisco, California 94111-5800
               BY:  MATTHEW D. BROWN, ESQUIRE
                    KYLE C. WONG, ESQUIRE
                    KAREN L. BURHANS, ESQUIRE
                    MAX BERNSTEIN, ESQUIRE
```

Reported By:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
              Official Reporter

```
 1   Thursday - December 8, 2016                      8:00 a.m.

 2                      P R O C E E D I N G S

 3                          ---oOo---

 4        THE CLERK:  Calling Civil 16-4884, Jason Parker versus

 5   Hey, Inc.  It's on for a motion to dismiss and for an initial

 6   case management.

 7        Counsel, please state your appearances.

 8        MR. TIEVSKY:  Alexander Tievsky for the plaintiff.

 9        THE COURT:  Thank you.

10   And over there.

11        MR. BROWN:  Matthew Brown, from Cooley, for Twitter.

12        MR. WONG:  Kyle Wong, from Cooley, for Twitter.

13        MS. BURHANS:  Karen Burhans, from Cooley, for Twitter.

14        MR. BERNSTEIN:  Max Bernstein, from Cooley, also for

15   Twitter.

16        THE COURT:  Thank you.

17        MR. POLLOCK:  And Stewart Pollock, also for plaintiff.

18   I'll be handing the case management.

19        THE COURT:  Great.  Have a seat.

20        Okay.  So we'll start with the motion to dismiss.  This is

21   Twitter.  So go ahead.

22        How come you're not letting those young people argue this

23   motion?

24        MR. BROWN:  Well, as we said in the case management

25   conference, we do have plans to have them very seriously
```

 1   involved in the case.

 2          **THE COURT:**  This would be an easy one for them to

 3   argue.  I'm going to let you argue, of course.  But how are

 4   they ever going to get the experience needed to convince the

 5   public that we have confidence in our system if they don't get

 6   these opportunities?

 7        In World War II -- yesterday was December 7th.  In World

 8   War II, the average age of the most advanced technology we had,

 9   the pilot was 27, the crew was 21.  If we could do that in

10   World War II we can let these young people over there argue

11   this motion.

12        Take that to heart.  I'm not going to hold it against you,

13   but it disturbs me that a motion this simple can't be argued by

14   a younger person.

15        Go ahead.

16          **MR. BROWN:**  Well, as Your Honor --

17          **THE COURT:**  I want you to know, I think you're

18   probably -- I'll just give you my tentative ruling for both

19   sides.  I think you're probably right under the standing point

20   and wrong on everything else.

21        So I'm going to probably give them leave to see if they

22   can amend to cure the standing problem.  I'm not sure they can.

23   But I think your First Amendment argument is bogus and all

24   those other arguments are bogus.  So except for standing, I

25   think you're right on that.

1    So that's where I'm leaning.  I'm not there yet, but you

2 go ahead and make your best points.

3        **MR. BROWN:**  Would Your Honor prefer that I start with

4 one of those particular issues?

5        **THE COURT:**  I think the First Amendment one, I don't

6 see how you can even make that argument with a straight face.

7    What you're doing is selling private information.  You

8 have to assume, for these purposes, it is private because if

9 you win on those other points then you don't need to reach the

10 First Amendment point.

11    But does the First Amendment itself allow you to enter

12 into a commercial deal to sell people's identifying information

13 and their identities and make money off of it?  I don't think

14 so.

15    Does Google have the right, under the First Amendment, to

16 sell how you go about conducting shopping searches on Google?

17 No.  Absolutely not.

18    So neither does Twitter.  So that's what the order is

19 going to say.

20        **MR. BROWN:**  Well --

21        **THE COURT:**  So, anyway, I feel like you have -- and

22 you ignore things like, the very Ninth Circuit decision you

23 rely on expressly says that it doesn't apply to selling the

24 person's rights, identifications and so forth.

25        **MR. BROWN:**  Maybe we should at least start on the

1   First Amendment argument.  We did make it.

2            **THE COURT:**  Let's hear your argument.

3            **MR. BROWN:**  And I hear Your Honor, your position.

4       Well, in the *Sarver vs. Chartier* case, I guess I would

5   start by saying that there's no prohibition on having First

6   Amendment protection even in situations where there may be some

7   profiting from the speech at issue.

8       But in the *Sarver vs. Chartier* case you had the Ninth

9   Circuit basically reviewing its body of case law that addresses

10  the interplay on the Right of Publicity cause of action and the

11  First Amendment, and held that in all --

12           **THE COURT:**  Can you use the microphone.  It's hard to

13  hear you.

14           **MR. BROWN:**  Sure.

15      Is that better?

16           **THE COURT:**  That's much better.  Thanks.

17           **MR. BROWN:**  And in all -- all of those cases that are

18  reviewed in its cannon there were only two circumstances in

19  which it found -- two kind of categories of circumstances, if

20  you will, in which it found that the Right of Publicity

21  interest outweighed the First Amendment interest.  And neither

22  of those are at issue here.

23      One of those categories of interests were if you had --

24  you had a person who had developed some economic value in their

25  name or likeness, and the conduct at issue, sort of,

appropriated that economic value in some way.  And the other

set of circumstances was if you had a celebrity and you were

using their persona or name or likeness in a commercial

advertisement.

     And here we have someone who hasn't alleged that they've

developed any sort of economic value in their name or likeness,

let alone that the conduct appropriates it in any way.

     There's no allegation that Twitter is profiting in any

way, and it's not.  And, in fact, the -- all Twitter is accused

of doing here is making available certain public profile

information, information that the plaintiff himself supplied

to --

          **THE COURT:**  That's not quite right.

     You give this outfit called Hey special access through --

I don't like the term "API."  I'm not going to use that.

     But through this special arrangement and partnership that

you have with Hey, they get special access that members of the

public don't get?

          **MR. BROWN:**  Members of the public could have seen that

information just in the same way that Hey could.

     All an API is, is a set of protocols that allows a

third-party app to get access to the data.

          **THE COURT:**  You're saying that I could somehow go

online right now and call up that app and get the same

information in the same form and at the same speed?

1     Probably not.  That's just a clever argument.

2     What you're saying is that if I get out my pencil and

3  paper and wrote it all down, over many hours of time I could

4  get a small fraction of the same information.  But you can do

5  it in lightening speed through the API.

6     **MR. BROWN:**  That shouldn't -- there should be no

7  consequence to that from a First Amendment perspective.

8     Whether that information is published on an HTML page

9  versus published through an API really should have absolutely

10  no consequence in terms of --

11     **THE COURT:**  Are you saying it's your act of providing

12  that information that is protected by the First Amendment?  Or

13  are you saying you have some derivative First Amendment

14  protection because of the way in which the end user, Hey in

15  this case, used the information?

16     **MR. BROWN:**  Both.  Twitter has a First Amendment right

17  to disseminate the information.  And then the users of the

18  app --

19     **THE COURT:**  Are you sure you said that in your brief?

20  My law clerk told me you didn't say that in your brief.

21     **MR. BROWN:**  We did, in fact, say that.

22     **THE COURT:**  Okay.  So you're saying you have a First

23  Amendment right to disseminate.

24     **MR. BROWN:**  That's right.

25     **THE COURT:**  And Hey has a First Amendment right to

1  publicize or create this game?

2          MR. BROWN:  Well, and also the users of the app, who

3  are largely Twitter users, also engage in all manner of

4  expressive conduct through the --

5          THE COURT:  People don't have the First Amendment

6  right to disseminate all kinds of personal identifying

7  information that criminals could get their hands on.

8      I just can't believe that the First Amendment allows that

9  kind of criminal conduct.

10          MR. BROWN:  There's nothing criminal about --

11          THE COURT:  Yes, there is.

12      If you were to turn over social security numbers and

13  personal identifying where people live and where celebrities

14  live and all kinds of things where people could hack into their

15  bank accounts, you're telling me that's protected by the First

16  Amendment?

17          MR. BROWN:  That's not what --

18          THE COURT:  No way.

19          MR. BROWN:  I'm not taking that position here.  That's

20  not what happened.

21          THE COURT:  That's close to what happened.

22          MR. BROWN:  It's not at all close.

23          THE COURT:  You're disclosing their -- their personas.

24          MR. BROWN:  Name and profile picture, to be precise.

25  That's it.

1      So that is distinct from a situation where --

2          THE COURT:  Now, if they had agreed to that, then you

3   win, of course.  But for First Amendment purposes we've got to

4   assume that you've lost that argument, that they have not

5   agreed to that.

6      So those are two separate things.  The First Amendment

7   comes only into play if your agreements are not good enough to

8   vouch for this.

9      If they agreed to it upfront, you win every day, I think.

10  That's clear.  But you have raised the First Amendment as an

11  additional point, so we have to consider it.

12          MR. BROWN:  I understand.

13     But I just want to make sure that our argument is coming

14  across, because the Court seems to be analogizing what happened

15  here to a situation where a social security number or some sort

16  of personal sensitive information was being used, allegedly, in

17  a way that violated a Right of Publicity statute.  And that's

18  not what is happening here.

19     We have a situation where Twitter users go to one of the

20  world's most open and public social networking sites and have

21  voluntarily provided their name and user name and a profile

22  photo.  Sometimes a profile of other than themselves.

23  Sometimes it's a picture of something else, that doesn't even

24  look like them.

25          THE COURT:  Well, but let's assume that the user has

```
 1   not approved that, not agreed to that, and you're doing it
 2   anyway.  That's where -- that's the only scenario where we
 3   reach the First Amendment.
 4       Why is that protected by the first -- your dissemination
 5   of that protected in this mass form so they can use it for a
 6   video game?  Why is that so protected?
 7           MR. BROWN:  Well, you have to use the framework that
 8   the Ninth Circuit has set out.
 9       So the Ninth Circuit has --
10           THE COURT:  That's the Sarver case; right?
11           MR. BROWN:  That's the Sarver case.
12           THE COURT:  Tell me what you think that case stands
13   for.
14           MR. BROWN:  So in Sarver, the Ninth Circuit makes
15   clear that Right of Publicity statutes are, by their nature, a
16   content based state regulation.  So they're presumptively
17   unconstitutional unless there is a narrowly tailored compelling
18   state interest.
19           THE COURT:  My law clerk, hand me up a copy of that
20   decision so I can follow where this comes -- comes into play.
21       Unless you've got it.  Do you have a copy there?
22           MR. BROWN:  I only have one marked-up copy.
23           THE COURT:  All right.
24           MR. BROWN:  Actually, we may have -- we may have one.
25   We've got another one.
```

1          **THE COURT:**  Make sure it's the official one, not

2    Westlaw.

3          **MR. BROWN:**  It's a Westlaw comment.

4          **THE COURT:**  My law clerk will go get it so I can

5    understand your argument.

6       Continue on.  Tell me the framework that you think is

7    there.

8          **MR. BROWN:**  So the Court starts by saying that Right

9    of Publicity statutes are presumptively unconstitutional, and

10   you've got to look at what speech is at issue in a particular

11   case and whether there's a narrowly tailored compelling state

12   interest that would, you know, outweigh that regulation or

13   provide a justification for that sort of content-based

14   regulation.

15         **THE COURT:**  Does this argument go to the Alabama

16   statute or to the dissemination part?  Sounds like it goes to

17   the Alabama statute.

18         **MR. BROWN:**  Well, all of this goes to the Alabama

19   statute because the claim that we're talking about here asserts

20   that the speech at issue violated -- violated the Alabama

21   right-of-publicity statute.

22      So you have to view it through that context.  We're not

23   looking at it, sort of, in a vacuum.

24         **THE COURT:**  You told me earlier you had two strings to

25   your bow.  One was the First Amendment protected your

dissemination, regardless of what the end use was.  And,

secondly, that the Alabama statute was unconstitutional.

        **MR. BROWN:**  Well, no.  What I'm saying is, you've got

to look at the allegations in the complaint.

    We're here on a motion to dismiss.  And what Twitter is

alleged to have done is provided information through the API to

Hey.

    And then in the other cause of action, which is -- and

there are two causes of action in the complaint.  One against

Hey only and one against Twitter only.  That's the allegation

against Twitter, that we -- that Twitter caused Hey to use name

and profile picture in the app.

    In the other cause of action against Hey, the allegation

is that Hey itself used name and profile picture in a way that

violated Alabama Act.

    So both defendants, in distinct causes of action, are

accused of violating the Alabama Right of Publicity.

        **THE COURT:**  All right.  I now have the opinion in

*Sarver*.  So what page do I look at to find --

        **MR. BROWN:**  Well, I mean --

        **THE COURT:**  -- key points?

        **MR. BROWN:**  There's a lot of discussion in here that's

relevant.

    But if you look at page 905, at the -- at the end of, kind

of, review of their previous case law, where they had

situations where they had to balance Right of Publicity claims against First Amendment defenses, they say:

     "In sum, our precedents have held that speech which either appropriates the economic value of a performance or persona, or seeks to capitalize off a celebrity's image in commericial advertising is unprotected by the First Amendment against the California Right of Publicity claim."

And then they go to apply those principles to the claim that was at issue here and held that there was a valid First Amendment defense.

And I don't want to interrupt you while you're reading.

     **THE COURT:**   The reason we reach this is that, as I said at the outset, the standing -- I'll just give an aside to the plaintiffs.

I think I know why you were clever in the way you pled, because you're worried about being able to certify class. That's a legitimate concern.

But in doing that, you have failed to explain the standing and -- the *Spokeo* standing of your individual plaintiff.  And it could turn out that when I force you to do that in the next round, that that pleads your way out of Rule 23.

So I understand that tradeoff.  And you're going to probably lose on that.  That's my tentative ruling.  You're going to have to come clean on it.

1    But, nevertheless, the reason we're even reaching the

2  First Amendment point -- because I would ordinarily say that's

3  the end of it, we're not going to reach the First Amendment.

4  But no, no, no, the defendant says you must reach all these

5  other points because it's futile to let them plead, try to

6  replead futility.

7    So you have invited this problem on yourself of now -- so

8  I have to assume that they're going to find some -- it's true

9  that on the present pleading they have not satisfied standing.

10 But you have invited them to try.

11   So have -- I don't reach this First Amendment point

12 unless, unless I give them an opportunity to replead.  And when

13 they replead, they probably are going to figure out some way to

14 satisfy the very language that you just read, which is that the

15 precedents hold that the First Amendment does not protect --

16 n-o-t, does not protect capitalization of economic value of

17 performance or persona.

18   And that is what is going on here, the word "persona."

19 They're going to be able to cure that point, and then it's

20 going to fit right into the First Amendment thing.

21      MR. BROWN:  I don't think they are going to cure that

22 point.

23   If you look -- if you look at the fact patterns in all the

24 cases in the Ninth Circuit, that the Ninth Circuit reviewed

25 here, there's nothing even remotely close to the fact pattern

1   that we have here.

2       There's no allegation that this plaintiff did anything

3   to --

4           **THE COURT:**  There's no allegation now.  If I give them

5   leave to amend --

6           **MR. BROWN:**  Then we'll have to see and take the

7   argument then.

8           **THE COURT:**  See, you're trying to have it both ways.

9       I'm not that dumb.  You know, I was a good lawyer at one

10  point.

11      The only reason that we reached the First Amendment point

12  is because of the concept of futility that you have -- you have

13  laid that out there and said there is no way, no way they can

14  plead around the standing problem.  And, therefore -- because

15  of the First Amendment.

16      Well, I disagree with that.  They might be able to say

17  that it fit within one of these prior cases.  We haven't even

18  let them try yet.

19      You brought this problem on yourself by raising futility.

20  You should have just stuck with standing and then raise it

21  maybe later.

22          **MR. BROWN:**  Well, no, I don't view it as a problem.

23      I mean, we don't think that -- the complaint that is

24  before the Court on this motion to dismiss, we think that that

25  claim as presented and pled is barred by the First Amendment.

1       **THE COURT:**  Yes, maybe.  That could be.

2   But didn't you yourself argue that I should not allow them

3   to replead standing on account of futility?  Now, maybe I'm

4   misunderstanding.  Didn't you make that argument?

5       **MR. BROWN:**  Yeah, we did.  But you may be

6   misunderstanding the nature of the argument.

7   So we don't think that there's any way that they can come

8   back in this kind of fact pattern and adequately plead real

9   facts, not legal conclusions sort of dressed up as facts --

10      **THE COURT:**  How do we know until we give them a chance

11  to do that?

12      **MR. BROWN:**  -- and plead standing.  I mean, that's our

13  argument.

14  And I realize that many courts will allow a second bite at

15  the apple on the complaint even when they dismiss for Article

16  III standing.  Not all courts do.  And many do.  So I get that.

17  But we're talking about the First Amendment.  It sounded

18  as though that was something that was concerning Your Honor.

19      **THE COURT:**  All right.  Stay right there for a second.

20  Let me hear from the other side.  What do you say to the

21  First Amendment point?

22  What's your name again?

23      **MR. TIEVSKY:**  Alexander Tievsky.

24      **THE COURT:**  How many years out of school are you?

25      **MR. TIEVSKY:**  I graduated law school in 2015.

1     THE COURT:  When?

2     MR. TIEVSKY:  2015.

3     THE COURT:  One year?

4     MR. TIEVSKY:  That's correct, Your Honor.

5     THE COURT:  Good for you.

6     Tell me what you say on their point -- in other words, I'm

7  particularly interested in Counsel said there's not a single

8  Ninth Circuit decision that comes close to protecting your guy

9  under the First Amendment.

10     And by "your guy" I'm not talking about any class, because

11  right now you represent just Mr. Parker.

12     MR. TIEVSKY:  Just Mr. Parker, yes, Your Honor.

13     THE COURT:  Okay.

14     MR. TIEVSKY:  As far as that's concerned, I think

15  there's two points that are important.  First of which is that

16  the reason that many of the decisions revolve around

17  celebrities in the Ninth Circuit is because the California

18  Right of Publicity Act specifically applies to famous people

19  and not to ordinary people.  And so that's the reason that we

20  see this fact pattern in a lot of the cases.

21     But the Alabama statute doesn't say that.  So we have to

22  work with what we've got.  And as far as what we do have, we

23  have an understanding that if you have -- you have what rights

24  the legislature gives you when somebody, as *Sarver* says, and

25  also the *NCAA* college athlete case says, when you've got a

1    company that's using someone's identity, using private

2    information about somebody that they had to sign a contract to

3    get in a way that they don't have consent to do it, then, no,

4    that is not protected by the First Amendment.

5          THE COURT:  So it sounds like you're conceding that in

6    the Ninth Circuit case of *Sarver*, where they reviewed the prior

7    decisions, they all dealt with celebrities.

8          MR. TIEVSKY:  Many of them do deal with celebrities.

9          THE COURT:  "Many" means some did not.  Give me an

10   example of one that's closest to your case.

11         MR. TIEVSKY:  Sure.  So the case involving the NCAA

12   athlete, *In re NCAA Student Athlete Name and Likeness Licensing*

13   *Litigation*.  Those -- those athletes are kind of celebrities;

14   right?  They're --

15         THE COURT:  I'm not -- I just want to see what was the

16   name of that decision?  The NAAC -- NCAA, I think you mean.

17         MR. TIEVSKY:  Yes.  It's cited on our brief at page

18   15.

19         THE COURT:  Was that dealt with in the *Sarver* case?

20         MR. TIEVSKY:  I don't know if it was cited in the

21   *Sarver* case.  I'm not certain that it was.

22         THE COURT:  All right.  Well, then was that

23   Judge Wilken's case?  Is that the one you're talking about?  Or

24   is that a different one?

25         MR. TIEVSKY:  It is Judge Bybee.

1    Sorry, yes, from Judge Wilken in this court, yes, Your

2    Honor.

3         **THE COURT:**  So that got up to the Ninth Circuit.  And

4    what did the Ninth Circuit say in that decision?

5         **MR. TIEVSKY:**  The Ninth Circuit considered --

6    considered the First Amendment issue in light of the idea of

7    transformative use, that you get protection for creative works.

8    And that's what came up in *Sarver*.  We're talking about a movie

9    there, a sort of story telling.

10    And you don't get protection when you're just taking

11    somebody's name and likeness and, sort of, using it in the same

12    context that -- that someone is known for or somewhat known

13    for.

14    So in this case we've got someone taking information out

15    of a social media website, putting it into another social media

16    website without -- without permission, without any kind of

17    consent.

18    Maybe to be clearer --

19         **THE COURT:**  What if these were politicians?

20         **MR. TIEVSKY:**  Politicians is a tricky hypothetical,

21    Your Honor, because of the sort of nature of the relationship

22    between people and government.  I don't -- I don't think

23    that --

24         **THE COURT:**  What if these were celebrities?  Public

25    figures, what if they were celebrities?

1      **MR. TIEVSKY:**  If they were celebrities they have a

2    right, certainly, under Alabama law to the commercial use of

3    their likeness.

4          **THE COURT:**  But under the First Amendment can't you

5    say that somebody puts a photograph of a celebrity and they

6    have the little "like" things and "not like," you're saying

7    that that would violate -- that the First Amendment doesn't

8    protect that kind of expression?

9          **MR. TIEVSKY:**  The First Amendment -- so there's

10   certainly -- there's certainly a balance here.  But I guess the

11   point here is that there's no -- in the use of these -- in

12   these people's names and likenesses, of my client's name and

13   likeness, there is no -- there is no creative expression.

14   There is no -- there is a mere taking of information and

15   putting it in another place in another context.  And that's --

16   that's what becomes problematic.

17      We're not talking about -- about the kind of expressive

18   work that -- that we recognize gets First Amendment protection.

19         **THE COURT:**  Well, what were the facts in the *Sarver*

20   case itself?

21         **MR. TIEVSKY:**  The *Sarver* case itself?

22         **THE COURT:**  Yeah, what were --

23         **MR. TIEVSKY:**  It involves an individual who was, you

24   know, a private individual who had some -- an interesting life

25   story that a major commercial film was made about him.  He sued

1    for Right of Publicity.

2         **THE COURT:**  What was the interesting part about his

3    life?

4         **MR. TIEVSKY:**  My recollection is that he -- is that he

5    was in the military.  He was a --

6         **THE COURT:**  Was he the guy in the movie called *The*

7    *Hurt Locker*?

8         **MR. TIEVSKY:**  Yes, that's correct.

9         **THE COURT:**  Is he the guy that disarmed the bombs?

10        **MR. TIEVSKY:**  Yes.  He was -- he was an IED disarmer

11   in the United States Army in 2004 and 2005.

12        **THE COURT:**  So the original Hurt Locker guy on whom

13   the story is based, he brought a lawsuit; right?

14        **MR. TIEVSKY:**  That's correct.

15        **THE COURT:**  And what did the Ninth Circuit hold about

16   the First Amendment in that case?

17        **MR. TIEVSKY:**  Regarding the First Amendment, the major

18   holding is that the First Amendment applies because this is --

19   the quote is, "It safeguards the storytellers and artists who

20   take the raw materials of life, omitting some, and transform

21   them into art."

22        The key here is, really, we're talking about a

23   transformative, creative use that is protected by the First

24   Amendment.  And we're not talking about like in the *NCAA* case.

25        And in this case, the mere taking of a person's likeness,

1  not to tell a story, not for any -- you know, any creative or

2  artistic purpose about the individual and just re-purposing it

3  to sell the product.  That's what's not okay.  That's what the

4  First Amendment doesn't protect.

5          THE COURT:  So your position is that the game that was

6  played had no transformative feature?  Is that it?

7          MR. TIEVSKY:  That's correct, Your Honor.  It

8  simply -- it simply -- as Your Honor said before, it took lots

9  of people's information at very high-speed out of their API and

10  spit it out onto another website for another purpose without

11  consent.

12          THE COURT:  If you say it's for another purpose, then

13  that does sound transformative.

14          MR. TIEVSKY:  Well, the purpose here is -- it is not

15  transformative in the sense that the -- the purpose is -- is

16  effectively commercial; right?  It's to buy and sell these

17  people's names and likenesses, to buy --

18          THE COURT:  Counsel is correct on the other side that

19  commercial is also protected.  There is -- you know, commercial

20  speech is protected speech.

21      Where is the word "transformative" used in the *Sarver*

22  decision?

23          MR. TIEVSKY:  The *Sarver* decision does not -- they

24  actually say -- so there's -- in footnote 6, the Court does

25  explain that they do not reach the question of the

1    transformative use.  I think that that -- they don't reach it

2    directly.  But the idea is the same.

3          The idea that we're looking at, you know, the emphasis on

4    the creativity and the artistic nature of the work, protection

5    of storytellers, makes this case, as far as its ultimate

6    conclusion, very different from what we have here.

7                **THE COURT:**  All right.  We've got to move on to the

8    next issue.

9          All right.  Let's go to the --

10               **MR. BROWN:**  Just one point of clarification.  It's not

11   an argument but just you had asked the question.

12         So the *Sarver* case does mention both the *Keller vs.*

13   *Electronics Arts* case, which is college football players, and

14   then also *Davis vs. Electronic Arts* case, which dealt with

15   professional football players.

16         Those are two of the cases that the Court said fell into

17   the categories of fact patterns that -- that in the past they

18   had held were the Right of Publicity interest outweighed the

19   First Amendment interest.  But obviously these are

20   distinguishable from the facts.

21               **THE COURT:**  All right.  So let's go to the

22   Communications Decency Act.

23         What would you like to say about that?

24               **MR. TIEVSKY:**  From the plaintiff, Your Honor?

25               **THE COURT:**  No, I want to hear from the defendant

first.

     **MR. BROWN:**  So there are no allegations here that --
that Twitter has developed or created the content whatsoever.
The allegations, the factual allegations against Twitter are
simply that it made certain data, which was supplied by the
plaintiff, available to Hey.

    And one case that I wanted to, kind of, draw the Court's
attention to is the *Kimzey*, K-i-m-z-e-y, *vs. Yelp* case.  That's
a Ninth Circuit case decided earlier this year.

    And that case is interesting for a number of reasons.  But
one of which is that it addresses both the publisher element of
CDA 230 immunity as well as the content creation or development
element.

    And in that case what happened is there was a locksmith
that received a negative review by a customer.  And in addition
to the negative narrative text, there was also a one-star
review, which is the lowest rating you can get on Yelp.  And
the plaintiff there alleged that Yelp was liable as a creator
or developer of the content and not as a publisher.

    And why did he allege that?  Two different reasons.  One
is that Yelp had created the star system that was then used by
the -- by the -- by the disgruntled customer that assigned the
one-star review.

    And, secondly -- and I think this is even more critical --
the complaint alleged that Yelp actually took the review and

1    then proactively posted the review as an ad or a promotional

2    link on Google.

3        So in that case you had an allegation.  This was just at

4    the complaint stage.  And whether or not those facts would have

5    held up ultimately I'm not sure.  But at the complaint stage

6    the allegation is that Yelp literally took that information and

7    posted it on the Google search engine as an ad or a promotional

8    link.

9        And the Court there held as follows:

10       "Nor do Kimzey's arguments that Yelp can be held

11       liable for republishing the same content" -- that is the

12       same content that was its HTML page on the website -- "as

13       advertisements or promotions on Google survive a close

14       scrutiny.  To the extent Kimzey's complaint aims at

15       alleged downstream distribution of the starred review,

16       Section 230's immunity defeats the claim.  Nothing in the

17       text of the CDA indicates that immunity turns on how many

18       times an interactive computer service publishes

19       information provided by another information content

20       provider."

21   And then here's the second point:

22       "Just as Yelp is immune from liability under the CDA

23       for posting user-generated content on its own website,

24       Yelp is not liable for disseminating the same content in

25       essentially the same format to a search engine, as this

1      action does not change the origin of the third-party

2      content."

3          Meaning that it was a third party who generated the

4      content and initially posted it.

5          "Simply put, proliferation and dissemination of

6      content does not equal creation or development of

7      content."

8          This was a Ninth Circuit case earlier this year.  And the

9      similarities are striking.  I mean, here, if anything, the

10     facts there were more extreme than what you have here.

11          **THE COURT:**  All right.  What do you say to that

12     decision?

13          **MR. TIEVSKY:**  That decision has nothing to do with

14     this case, Your Honor.

15          **THE COURT:**  What?

16          **MR. TIEVSKY:**  That decision has nothing to do with

17     this case.

18          The CDA is about making sure that -- that companies that

19     host user content, user-generated content, aren't liable for

20     the things in that content.

21          I mean, the sort of canonical CDA example is, I get on a

22     message board.  I post something defamatory, and they try to

23     sue the guy who wrote the message board.

24          Well, CDA says you can't do that, right, because we want

25     to retain the free flow of information.  We want to make it

1    not, sort of, a liability for -- liability pitfalls to run a

2    website where users can post their own information.

3        But what's going on here is not quite like that because

4    the information itself that was posted by Mr. Parker, as far

5    as -- as far as that information itself, there's nothing

6    intrinsically wrong with it.  It's not defamatory.  We're not

7    seeking to hold them liable for something that's -- you know,

8    that a user, sort of, just posted on their website and they

9    host it.

10       What's going on here is that they took his information

11   without -- without consent and then put it in another place,

12   used it in a different manner, violated his Right of Publicity.

13       And I think Judge Koh's decision in *Fraley v. Facebook*

14   illustrates this well, where in that case they had -- Facebook

15   had taken people's names and likenesses and put them together

16   with a company logo, something that said "Sponsor Story" up

17   top, and sort of re-purposing, you know, all content that the

18   user had put up there in some form, but that Facebook had

19   recombinated.

20       And Judge Koh said there is no CDA immunity in a case like

21   that because the -- the term of art is "information content

22   provider" in that case.  Facebook is the information content

23   provider.

24           **THE COURT:**  The *Kimzey* and *Yelp* case involving the

25   locksmith, say very succinctly why you think it does not apply

1  here.

2      I never got your point.

3      **MR. TIEVSKY:**  Because the key in that case is that the

4  locksmith is unhappy about the content of what the user put on

5  the website; right.  They are seeking to hold Yelp liable for

6  something that one of Yelp's users posted on there.  That's the

7  canonical --

8      **THE COURT:**  Counsel says it went further and that Yelp

9  somehow put it on Google as well, and that that was protected

10 too.

11     **MR. TIEVSKY:**  That still is seeking to hold Yelp

12 liable for something that ultimately -- that the alleged

13 defamation comes only from Yelp's publication and republication

14 of the user's content and -- as it is.

15     **THE COURT:**  That's counsel's point.  He's saying here

16 we're dealing with republication from -- from the Twitter site

17 to the Hey site.

18     **MR. TIEVSKY:**  Let me put it another way.

19     The original problem in the content in Yelp comes from

20 Yelp's user who put it up.  Yelp's user said something

21 defamatory.  And the plaintiff was seeking to hold Yelp liable

22 for something that Yelp's user had written that was defamatory.

23     And in this case the original -- the original speech

24 Mr. -- what Mr. Parker put up on Twitter is not legally

25 problematic in any sense.  What creates the problem is what

Twitter then did with that afterward.  So it's Twitter's

actions that caused the legal problem, not Twitter's user's

action.

The CDA is designed to make sure that when users of an

interactive -- an interactive service do something that's

illegal on it, put content that is illegal on it, the provider

of that service has immunity.

**THE COURT:**  Let's go to the consent issue.

**MR. BROWN:**  So the consent argument really turns on

the language of the privacy policy and the terms of use.

Again, it's important to focus on what the actual factual

allegations in the complaint are against Twitter and not focus

on what the allegations are against Hey.

The allegation against Twitter is that they essentially

failed to revoke access to the data through the API.  And that

almost precise language is used by the plaintiffs.

And, in fact, in the privacy policy I thought it would be

helpful to talk about the structure, and then I'll get to the

key term.

Right at the beginning of the privacy policy they talk

about basic account information.  And it explains to users that

when you create your account you provide some personal

information such as name, user name, and on the Twitter

services -- this is a quote now -- "Your name and user name are

listed publicly, including on your profile page and in search

results.  You can use either your real name or a pseudonym."

And then in the next section entitled, "Additional Information," it says, "You may provide us with profile information to make public on the Twitter services, such as," and it lists a number of things, including a picture.

And then -- and this is Castro declaration Exhibit G at page 3.  The language says, "The Twitter services broadly and instantly disseminate your public information" -- and that means name, user name and photo, among others -- "to a wide range of users, customers and services.

"For instance, your public user profile information and public tweets are immediately delivered via SMS and our APIs to our partners and other third parties, including search engines, developers and publishers that integrate Twitter content into their services."

And then it goes on to give a few examples.

That has not, by the way, been -- the applicability of that provision hasn't been disputed in the plaintiff's opposition.  And maybe I -- I think that was a little bit unclear.  They haven't made an argument against that provision providing the consent that we say it provides.

So in that respect I believe --

THE COURT:  How can I go outside the four corners of the complaint?

MR. BROWN:  All of these should be held to be

1   incorporated by reference.

2          **THE COURT:**  Should be?  You're saying every single

3   document that you rely on is called out in the complaint?

4          **MR. BROWN:**  No.  But that's not the standard.

5       The -- and, by the way, they don't object to this.  They

6   just say --

7          **THE COURT:**  That's a different point.

8          **MR. BROWN:**  I understand.

9          **THE COURT:**  You know, why shouldn't I just allow

10  wide-open discovery into this, since it's a rule -- Rule 12

11  says you converted it to summary judgment.  Rule 56 says I've

12  got to give discovery.

13      I mean, the defendants are doing this more and more of

14  trying to win the case on Rule 12, by bringing in extraneous

15  documents.

16         **MR. BROWN:**  Well --

17         **THE COURT:**  Let's find out.

18      Do you object to these documents?

19         **MR. TIEVSKY:**  We took no position on them, Your Honor.

20  Honestly, I don't know if it's --

21         **THE COURT:**  Do you refer to these documents in your

22  pleading?

23         **MR. TIEVSKY:**  No, Your Honor.

24         **MR. BROWN:**  An element of their claim is lack of

25  consent.  And they can't just ignore the fact that they signed

1  up to a service that has applicable terms of service and

2  privacy policy that directly go to the issue of consent.

3      And there's ample case law in the Ninth Circuit holding

4  that if you've got a complaint that depends on a document or

5  relies on it implicitly, that it can be incorporated by

6  reference into the complaint.

7      You know, Your Honor --

8          **THE COURT:**  What's the name of that decision?

9          **MR. BROWN:**  So that's *Knievel vs. ESPN*.

10         **THE COURT:**  Give it to me.

11         **MR. BROWN:**  *Knievel*... like Evel Knievel.

12         **THE COURT:**  Yeah.

13         **MR. BROWN:**  ... *vs. ESPN*, 393 F.3d 1068, Ninth

14 Circuit.

15         **THE COURT:**  Can my law clerk go get me that, 393 F.3d.

16         **MR. BROWN:**  And then Your Honor had a case *Avila vs.*

17 *Wells Fargo Bank*, where you held as incorporated a loan

18 document in a wrongful foreclosure action.  A loan document

19 that was not attached to the complaint.

20         **THE COURT:**  Well, it may not have been attached, but

21 was it referred to in the complaint?

22         **MR. BROWN:**  I would need to take a look at that, Your

23 Honor.

24         **THE COURT:**  I know if it's referred to, like this

25 happens all the time, if the complaint refers to a document,

1   even though it's not attached, then the defendant can say,

2   well, here's the document.

3            MR. BROWN:  The doctrine has been extended far beyond

4   that.

5        And there's another case I want to bring Your Honor's

6   attention to because it's cited, but it may be buried a little

7   bit.  And that's called *Garcia vs. Enterprise Holdings*.  It's a

8   Northern District case.  78 F.Supp 3rd 1125.

9        And that was a case against the service called Zimride.

10  And the complaint omitted any reference to the TOS or the

11  privacy policies, the terms of service or privacy policy.

12       The plaintiff alleged that he signed up to use Zimride,

13  but that he never consented to the disclosure of his personal

14  information.  And the Court held that -- that it was going to

15  look at those documents, the TOS and the privacy policy,

16  because plaintiff necessarily had to agree to them to use the

17  service.  And the lack --

18           THE COURT:  Is it my decision?

19           MR. BROWN:  Pardon?

20           THE COURT:  Is *Garcia* one that I wrote?  Who is the

21  judge?

22           MR. BROWN:  No, I don't have -- I don't know.

23           THE COURT:  That's a Northern District decision?

24           MR. BROWN:  Correct.

25           THE COURT:  So that's not Court of Appeals?

1          **MR. BROWN:**  That's correct.

2          **THE COURT:**  Okay.  Well, that doesn't count for as

3    much.

4        I now have the Court of Appeals decision here in the *ESPN*

5    case.  So what page do you want me to look at?

6          **MR. BROWN:**  1076.  And I don't have the decision right

7    in front of me at the moment.

8          **THE COURT:**  1076.  All right.

9        I'll just read part of it.

10         "Our approach is permissible under the incorporation

11       by reference doctrine which permits us to take into

12       account documents whose contents are alleged in a

13       complaint and whose authenticity no party questions but

14       which are not physically attached to the pleading."

15       Well, I agree with that.

16         **MR. BROWN:**  Keep on reading.  Keep on reading.

17         **THE COURT:**  Okay.

18         "We have extended the incorporation by reference

19       doctrine to situations in which the plaintiff's claim

20       depends on the contents of a document, the defendant

21       attaches the document to its motion to dismiss, and the

22       parties do not dispute the authenticity of the document

23       even though the plaintiff does not explicitly allege the

24       contents of that document in the complaint."

25       And that cites to *Parrino v. FHP*, 1998.  Several cites

1    here.

2         "The rationale of the incorporation by reference

3         doctrine applies with equal force to Internet pages as it

4         does to printed material.  Just as a reader must absorb a

5         printed statement in the context of the media in which it

6         appears, a computer user necessarily views web pages in

7         the context of the links through which the user accessed

8         those pages."

9         All right.  So I think the language you're focusing on is,

10   "We have extended the incorporation by reference doctrine to

11   situations in which the plaintiff's claim depends on the

12   contents of a document."  "Depends on the contents of a

13   document."

14        So what document is it that the plaintiff's claim depends

15   on here that you want me to take judicial notice of?

16        **MR. BROWN:**  They're alleging use of name and profile

17   picture without consent.  And the lack of consent is an

18   affirmative element that they have the burden of proof on.

19        And they allege that there was no consent.  But what they

20   want to do is completely hide the fact that they had to agree

21   to terms of service and privacy policy in order to use the very

22   service that they say didn't have consent to do the thing that

23   they alleged.

24        **THE COURT:**  All right.  Let me -- what do you say to

25   that point?

1    **MR. TIEVSKY:**  There's a few things.  The first is that

2    beyond the terms of service and privacy policy --

3         **THE COURT:**  You're going too fast.  You have to speak

4    more slowly and distinctly.

5         **MR. TIEVSKY:**  I apologize, Your Honor.

6         Beyond the terms of service and privacy policy, there's a

7    number of pages attached to this motion to dismiss, including

8    declarations of counsel executed after the filing of the

9    complaint.  So it's very difficult to see how those would have

10   been incorporated into our complaint by reference or otherwise.

11        As far as the terms of service and privacy policies

12   themselves are concerned, we don't dispute their authenticity.

13   There may be questions about contract formation that aren't

14   raised.

15        **THE COURT:**  If you concede the terms of -- so you're

16   conceding that the document they gave us on terms of use is

17   authentic and applied in your case?  Is that right?

18        **MR. TIEVSKY:**  It's authentic.  I do not -- I do not

19   believe that it is necessarily implicated by our complaint.

20        **THE COURT:**  Well, how do you get around it?  What is

21   the way in which you plan to get around that document?

22        **MR. TIEVSKY:**  Well, the document that they submitted

23   is not complete.  So what -- what they've done is miss a very

24   important phrase in the document.

25        **MR. BROWN:**  That's just not true.

1          **THE COURT:**  Just a minute.

2      What is the phrase that was missing?

3          **MR. TIEVSKY:**  So the phrase that's missing -- and they

4   do quote it in their motion, but they don't address it at

5   all -- is that it's subject -- the information is given to

6   third parties through the API -- let me make sure I get the

7   exact phrase -- "subject to our terms and conditions for such

8   content use."

9      Now, the terms and conditions for such content use are the

10  developer agreement, the contract that Twitter and Hey or any

11  other entity that wants to use Twitter's API has to enter into

12  with Twitter.

13     So if the Court is going to take judicial notice of the

14  documents that Twitter asked the Court to take judicial notice

15  of, the full picture, which includes the developer agreement

16  that --

17         **THE COURT:**  Well, is that part of this record?

18         **MR. TIEVSKY:**  Yes, it's attached to --

19         **THE COURT:**  The developer -- I'm sorry, the developer

20  terms and conditions for developer, is that part of the record?

21         **MR. TIEVSKY:**  It is attached to our response to their

22  motion, Your Honor.

23         **THE COURT:**  All right.  You attached it?

24         **MR. TIEVSKY:**  That's correct, Your Honor, because they

25  did not include the complete -- they -- what they attached, as

1  far as their judicial notice request, is incomplete.  It does

2  not include all of the information required to understand the

3  document that they say is --

4       THE COURT:  Given that you attached it -- right? --

5  what is the significant part of that document that you think

6  would help you in the end?

7       MR. TIEVSKY:  That document requires Hey and anyone

8  else who uses the Twitter API to, quote, get the user's express

9  consent before," and there are a number of conditions listed,

10  including, "using a user's content to promote a commercial

11  product or service."

12       And so all of this he gave consent is not quite accurate.

13  Because what he gave consent to do is not what actually Hey,

14  and Twitter helping them, ended up actually doing.  They used

15  his information pulled from the API to promote a commercial

16  product or service.

17       Now, under the developer agreement, which is incorporated

18  as part of the terms of service, Twitter -- Twitter and Hey

19  were supposed to pay, probably, was supposed to get consent

20  before they did that.  They did not do so.

21       THE COURT:  Read that language to me again that the

22  developer, in this case Hey, was supposed to get?  What kind

23  ever consent from whom?

24       MR. TIEVSKY:  "Get the user's" -- that's Mr. Parker --

25  "express consent before..." There's a number of things that

1    they are supposed to get user's express consent before doing.

2    One of them is, quote, using a user's content to promote a

3    commercial product or service.

4         **THE COURT:**  Stop there.

5         What do you say to that point?

6         **MR. BROWN:**  A couple of things.  First of all, just to

7    be clear, we have provided complete copies of the privacy

8    policy and the terms of service.  They were not --

9         **THE COURT:**  You didn't provide the document that he

10   attached to his brief.

11        **MR. BROWN:**  That's right.  It's not incorporated by

12   reference into either of those.  So that's why we didn't --

13        **THE COURT:**  Maybe that's a good point.  But,

14   nevertheless, the documents you did provide referred to that

15   document.

16        **MR. BROWN:**  All right.  So just hear me out on this.

17        So the language that I read to you earlier comes from the

18   privacy policy.  They have not disputed that language.  Their

19   opposition doesn't address it.  And what he was just reading

20   from are the terms of service, not the privacy policy.

21        So let's first make that fundamental point.  All the

22   language I just read to you, which I think is dead on point,

23   they have not objected to, and he hasn't even addressed.

24        Now, turning to the terms of service, which is a distinct

25   document -- and that one is at Exhibit F of the Castro

1  declaration -- that in the TOS it explains, first, that the

2  information you submit to the Twitter services is public by

3  default and is able to be viewed by other users and through

4  third-party services and websites.

5      And it then next says that, "By submitting this

6  information you provide Twitter with a license to modify it, to

7  publish it, to display it in any and all media or distribution

8  methods."  Okay.  That's again Exhibit F, at page 4.

9      And then we get to the term that he's decided to focus on,

10  which ignores all the other things I've just read to you.  And

11  that says, "You agree that this license includes the right for

12  Twitter to provide, promote and improve the services and to

13  make content submitted to or through the services available to

14  other companies, organizations, or individuals who partner with

15  Twitter for the syndication, broadcast, distribution, or

16  publication of such content and other media and services,

17  subject to our terms and conditions for such content use."

18          THE COURT:  Wait.  That last phrase is the key phrase.

19          MR. BROWN:  Right.

20          THE COURT:  So he points out that the "subject to"

21  language incorporates a requirement by the developer to get

22  Parker's express consent.

23          MR. BROWN:  First of all, as a matter of just textual

24  interpretation, that "subject to our terms and conditions or

25  such content use," all that's saying is that the other

1   companies, organizations or individuals who partner with

2   Twitter are subject to a developer agreement.  That's all it

3   says.  It's not saying that the consent that the Twitter user

4   is giving to Twitter is somehow conditioned on whether --

5           **THE COURT:**  That's what you say now.

6           **MR. BROWN:**  -- there's adherence.

7           **THE COURT:**  That's what you say now, but maybe that's

8   not the way it ought to be read.

9       I'm supposed to resolve that on a motion to dismiss?  Why

10  don't we have four or five depositions on both sides, to see

11  how people would actually read this and understand it, as

12  opposed to lawyer argument on a motion to dismiss where these

13  things are not even attached to the complaint.

14          **MR. BROWN:**  Let me make this final point.  And I think

15  this is really important because earlier we heard the claim

16  that we had omitted something, which we hadn't.

17      And you asked Counsel to read the language from the

18  developer agreement.  And this is attached to their

19  declarations, the Stewart Pollock declaration.  And this is the

20  second page of that, section C, subsection 1, and then sub C.

21      And what it says in total is, one, "Get the user's express

22  consent before you do any of the following:" -- and I'll jump

23  down to sub C -- "Use a user's content to promote a commercial

24  product or service."

25      I'm going to stop there for just one moment.  That's what

1    he read to you.  There's no allegation in the complaint that

2    there's -- that this is being used to promote any commercial

3    product or service.

4         But it actually goes on.  So even if you were to truncate

5    it there, which you shouldn't, we would be fine.  But it goes

6    on.  It says "either on a commercial durable good or as part of

7    an advertisement."

8         That entire provision that they're trying to rely on --

9    and, by the way, they're trying to rely on it by pulling it

10   back into the terms of service -- doesn't even apply here.

11   They have truncated the language.

12        And you just asked them to read it to you, and he stopped

13   halfway through.

14             THE COURT:  Okay.  Is that true?

15             MR. TIEVSKY:  That line does appear at the end of it.

16             THE COURT:  How come you didn't read me that part?

17             MR. TIEVSKY:  It is not -- it is not relevant to the

18   question at hand.

19             THE COURT:  Well, it seems relevant.  Was it used on a

20   product, tangible product?

21             MR. TIEVSKY:  It doesn't necessarily say a tangible --

22             THE COURT:  Read it to me again.

23             MR. TIEVSKY:  So the second part says -- so it says,

24   "Use a user's content to promote a commercial product or

25   service either on a commercial durable good or as part of an

1   advertisement."

2        **THE COURT:**  Well, this is not a "durable good," is it?

3        **MR. TIEVSKY:**  I don't know what durable good means,

4   Your Honor.

5        **THE COURT:**  Durable?

6        **MR. TIEVSKY:**  I don't know if an electronic --

7        **THE COURT:**  Were you born inside the Internet or

8   something, and you never saw something like -- this thing right

9   here is a durable good (indicating).

10       **MR. TIEVSKY:**  I was pretty close to being born inside

11  the Internet.

12       **THE COURT:**  A watch is a durable good.  An automobile

13  is a durable good.  Things on the Internet don't really exist.

14  Those are virtual.

15       **MR. TIEVSKY:**  To the contrary, Your Honor.  To the

16  contrary, Your Honor.  They do exist.  And they're extremely

17  durable.  They never go away.

18       **THE COURT:**  Look.  You should have read me the whole

19  thing.

20       **MR. TIEVSKY:**  I apologize, Your Honor.

21       **THE COURT:**  All right.  I'm going to go, now, to the

22  case management part of this and give you a schedule.

23       **MR. TIEVSKY:**  Your Honor, did you want to discuss the

24  *Spokeo* issue?

25       **THE COURT:**  No.  No.  Because you're going to lose on

1   that one.  And I -- but I am going to give you a chance to try

2   to bring a motion to show me how you can replead around that.

3       All right.  I'm going to give you your schedule and then

4   you can try to talk me out of it.  Ready?

5       And this is on the assumption the case stays alive of,

6   course.  I don't know that it will, but probably it will.  But

7   I don't know.  Here we go:

8       Initial disclosures should have already been done.  Have

9   they been done?

10          **MR. POLLOCK:**  No, Your Honor.

11          **THE COURT:**  What?

12          **MR. POLLOCK:**  The initial disclosures have not been

13  done yet.

14          **THE COURT:**  Why not?

15          **MR. POLLOCK:**  In discussing with counsel, we had

16  agreed to make the initial disclosures two weeks from the date

17  of this hearing.

18          **THE COURT:**  Well, you know you don't have the

19  authority to make such agreements.  The rule says it should be

20  done before this conference.

21          **MR. BROWN:**  The rule says that it can be altered by

22  stipulation, I believe, Your Honor.

23          **THE COURT:**  Stipulation?  Let me see what the rule

24  says.  Maybe you're right.

25      This is -- the book I got here is a little old, but let's

see.  Well, it does say, "Except as exempted by Rule
26(a)(1)(B) or otherwise stipulated or ordered by the Court a
party must," et cetera, et cetera, et cetera.  So it does seem
to say that you could stipulate around it.

Well, all right.  I'm going to give you two weeks from
today.

**MR. POLLOCK:**  Thank you, Your Honor.

**THE COURT:**  That will be December 22.  Okay.

Leave to add any new parties or pleading amendments must
be sought by March 2.  Motion for class certification must be
filed on the normal 35-day track, by June 8.  Fact discovery
cutoff will be November 30.  That's also the day that your
experts' reports are due if you have the burden of proof on the
issue.

When the order comes out, it will explain how the
opposition and reply reports work by the experts.

The last date to file a motion for summary judgment will
be January 4, 2018.  I think you're the first case I've had
where I've calendared anything in 2018.  But I believe that's
right.  2018, January 4.  Final pretrial conference March 1,
2018.  And a jury trial on March 19th, 2018.

And the case will be referred to Magistrate Judge Jackie
Corley for mediation.  I do not allow private mediation in a
putative class action.  So it has to go through one of our
magistrate judges.  I'm choosing Jackie Corley.

1    Okay.  You can try to talk me out of this.  Any objections

2    to that schedule?

3        **MR. POLLOCK:**  Your Honor, plaintiff agrees with the

4    schedule that the Court has proposed.

5        **THE COURT:**  How about defense?

6        **MR. BROWN:**  Can I have just one moment to look at what

7    we proposed?

8        **THE COURT:**  Sure.  You had a very complicated thing

9    that was tied into class certification.  And it was so hard to

10   do the math on that, I just gave you what I thought was a

11   generous schedule.

12    Go ahead.  Take a moment.

13        **MR. BROWN:**  And I have some hard dates that I could

14   suggest that corresponds to that schedule.  The reason we did

15   it that way -- I know it looks a little bit confusing, but

16   obviously we're not sure whether this case is even going to

17   proceed and, you know, whether there might be amendment --

18   leave to amend given.

19    So we were trying to just, you know --

20        **THE COURT:**  Well, in every case for the last 17 years

21   I have used my formula.  And I don't use your formula.  If I

22   adopt your formula, it will confuse me to no end.  I have to

23   have the same kind of formula for every case.  So I'm not going

24   to adopt your formula where it ties into other dates.  I'm just

25   giving you hard dates.

```
 1            MR. BROWN:  Understood.

 2            THE COURT:  So I can't imagine that a trial so far

 3   out, 16 months out, is going to be a problem for you.

 4            MR. BROWN:  So I would like to try to convince Your

 5   Honor not to have the class certification briefing done on the

 6   standard 35-day schedule.  It's a very significant

 7   consequential motion.

 8            THE COURT:  How much time do you think you need?

 9            MR. BROWN:  Well, let's see.  I'm looking at how we

10   had talked about it, and maybe --

11            THE COURT:  I'll give each side one additional week.

12   So that will be, instead of 35 it will be a 49-day schedule.

13   And you just remember that you each get one extra week.  You

14   get an extra week on the opposition.  You get an extra week on

15   the reply.  And I'll stick with two weeks for me to review the

16   material.  Okay.  49-day track.

17            MR. POLLOCK:  Your Honor, I apologize.  I should have

18   raised this earlier.

19         The only issue that plaintiff is concerned about is the

20   date with the leave to amend.  And that's because the other

21   defendant, Hey Inc., has not appeared and is going through

22   dissolution proceedings with an assignment for the benefit of

23   creditors.

24         We may discover that there are additional parties.  We

25   would need to be able to conduct discovery against Hey before
```

1   we would be able to make that determination.

2       **THE COURT:**  I'll give you until April 28th.

3       **MR. POLLOCK:**  Thank you, Your Honor.

4       **MR. BROWN:**  The only other thing, Your Honor, that I

5   just wanted to raise with you is, you know, in the way that we

6   have been thinking about doing this and had agreed upon, there

7   would be some dates set for -- for exchanging any expert

8   disclosures or reports that bear on class certification.

9       In the schedule that you laid out, there isn't any -- any

10  specific deadline for that.  And the only issue there is that

11  if they wait until -- and we can do it this way, but I would

12  ask for more time.  If they wait until the day that they file

13  their motion for class certification and just drop on us all

14  their expert disclosures or expert reports as attachments to

15  the motion, that makes it extraordinarily difficult for us then

16  to prepare an opposition.

17      **THE COURT:**  What do you say to that?  And are you

18  going to rely on an expert?

19      **MR. TIEVSKY:**  At this point, it's difficult for me to

20  know what experts we're ultimately going to need.

21      In terms of -- I mean, the main discovery issues that I'm

22  seeing here are going to be related to the consent issue which

23  Your Honor already raised.  It's likely going to require

24  multiple depositions.  And then additionally understanding the

25  business relationship between the parties, Hey and Twitter.

1   Whether or not there's going to --

2         **THE COURT:**  If you do rely upon an expert, what do you

3   say to Counsel's point?

4         **MR. POLLOCK:**  We don't intend to spring anything on

5   them.  We're happy to have --

6         **THE COURT:**  Well, if you file it on the day that your

7   motion is due, he's going to say you sprung it on him.

8         **MR. POLLOCK:**  We're --

9         **THE COURT:**  Then he will have three weeks to take the

10  deposition.

11      So I think that's a fair point.  So I'm going to put in

12  here that both sides must give detailed notice of any intent to

13  use expert evidence on a motion in connection with the motion

14  or opposition, and must do so, we'll say, four weeks -- four

15  weeks -- four weeks before actual use.  That way the other side

16  can go get their counter expert, and you can also go take

17  somebody's deposition.

18      Now, this is not the final report.  This is just you send,

19  say, a two-page letter describing what the expert areas are

20  going to be and how you expect them to -- how to use it.  It

21  still won't be the final report, but it will be enough

22  information that the other side can go -- you've got to

23  identify who they are -- take their deposition and so forth.

24      Does that work?

25        **MR. POLLOCK:**  Yes, Your Honor.  That's fine.

1      **THE COURT:**  How about you?

2      **MR. BROWN:**  Just so I understand, so then for our --

3  for our expert, we would need to make that disclosure four

4  weeks before our opposition was due?

5      **THE COURT:**  Before you actually use it.  But you don't

6  have to -- so they presumably would go first on the plaintiff's

7  side.

8      **MR. BROWN:**  Right.

9      **THE COURT:**  But your time will be ticking.  And four

10  weeks before you have to file your opposition, you've got to do

11  the same thing.

12      **MR. BROWN:**  Understood.

13     Yes, I do think that works.

14      **THE COURT:**  All right.  We'll see.  I don't have as

15  much experience with doing it this way, but I'll learn

16  something here.

17     What else can I help you with on this?

18      **MR. BROWN:**  I think that's it.

19      **THE COURT:**  All right.  I will be your discovery

20  referee.  I expect you to be reasonable and to -- but please

21  read my discovery guidelines.

22     I want to make sure you understand that you cannot talk

23  settlement, period, until after class certification, unless

24  there's some very good reason to do it ahead of time, in which

25  case you've got to make a motion to be appointed interim

1    counsel and explain that to me.

2          **MR. POLLOCK:**  Understood, Your Honor.  We've reviewed

3    the order.

4          **THE COURT:**  Good.

5          **MR. BROWN:**  One other question.

6      I wanted to understand your, sort of, view on the

7    discovery.  I know we've got the initial disclosures in two

8    weeks.  But given Your Honor's indication that you're intending

9    to grant the motion on -- for lack of standing, how does that,

10   sort of, play into the discovery schedule?

11         **THE COURT:**  I think you ought to just get moving on it

12   because we will be -- in due course, we will -- I'm not staying

13   discovery pending the motion to dismiss, because by the time

14   you actually get around to producing anything the motions to

15   dismiss will have been decided either in your favor or in their

16   favor.

17      So no harm will be done by allowing discovery -- or very

18   little harm.  Can't say none.  Very little harm will occur.

19   But there will be harm going the other way if we wait.

20      So please don't use the -- this as an excuse to stonewall

21   on either side.  For example, you could go tomorrow and take

22   the deposition of Mr. Parker and find out what's going on

23   there, if you want.

24         **MR. POLLOCK:**  Understood, Your Honor.

25         **THE COURT:**  Where does he live?  What part of Alabama

1   does he live?

2           **MR. POLLOCK:**  I believe Mr. Parker is in Huntsville.

3           **THE COURT:**  Okay.  Is he legitimate?  I mean, did you

4   go out and recruit him, or did he come to you?  And how did

5   this all come about?

6       Why in the world are you suing in California on an Alabama

7   statute?  We don't have any experience with Alabama statutes

8   here.  A judge there would have a lot of experience.

9           **MR. POLLOCK:**  Are these questions that you would like

10  me to answer right now?

11          **THE COURT:**  I'm just curious.  How come you didn't sue

12  in Alabama?

13          **MR. POLLOCK:**  The reason that we sued in California is

14  because this is where both the defendants are located, and it's

15  where we think more of the witnesses will be likely to be

16  present.

17          **THE COURT:**  Okay.  Usually it's the other way around.

18  They sue in Alabama and then Twitter, or whoever, is

19  complaining they got sued there.

20      So fine.  Okay.  An interesting case, Counsel.  Thank you

21  very much.

22          **THE CLERK:**  Judge --

23          **THE COURT:**  My clerk has something to say.

24          **THE CLERK:**  Can I find out what the date was you gave

25  for the pretrial conference?

1      **THE COURT:**  Yeah, if I can find it myself.  March 1.

2      **THE CLERK:**  Okay.  That is a Thursday.  So I just want

3  to be clear.

4      **THE COURT:**  Don't want to do it on a Thursday.  Hang

5  on a minute.  You're right.  I should have said August -- no,

6  wait a minute.  No, no, no.

7      **THE CLERK:**  March 7 or 14th.

8      **THE COURT:**  I don't even have the right year here.

9      **THE CLERK:**  It would either be March 7th or 14th, as

10  the trial --

11      **THE COURT:**  We're going to say March 7th.

12      So you should know, I've learned the hard way, between

13  March 7th and the 19th is -- what? -- two weeks, maybe not even

14  that much.  So if I knock out your damages study because of

15  *Daubert*, you don't get a second bite.  You just go to trial

16  without a damages study.

17      Same thing on the defense side.  If I knock out your

18  expert for whatever, because it's *Daubert* infected, too bad.

19      This is good.  This is a good rule because this encourages

20  you to do it right the first time and not take two bites at the

21  apple.  It's a very good policy reason for not giving you two

22  bites at the apple.

23      So you should be very careful on your experts and err on

24  the side of admissibility and not on the side of greed.  Okay.

25      **MR. POLLOCK:**  Thank you, Your Honor.

1          **THE COURT:**  All right.  Good luck to both sides.

2          **MR. BROWN:**  Thank you.

3          (At 9:13 a.m. the proceedings were adjourned.)

4                              -   -   -   -

5

6                    <u>**CERTIFICATE OF REPORTER**</u>

7          I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10   DATE:   Wednesday, December 14, 2016

11

12

13

14   _____

15        Katherine Powell Sullivan, CSR #5812, RMR, CRR
                     U.S. Court Reporter

16

17

18

19

20

21

22

23

24

25